IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MATTHEW ADAM JAY,

      Petitioner,

    v.

ANTHONY KANE, Warden,

      Respondent.

_____/

No. CV 06-01795 CW

ORDER GRANTING PETITION
FOR WRIT OF HABEAS
CORPUS

On March 8, 2006, Petitioner Matthew Adam Jay filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. section 2254, challenging as a violation of his constitutional rights the sixth denial of parole by the California Board of Parole Hearings[1] (Board) on May 5, 2004.

On March 23, 2006, the Court issued an order to show cause why the writ should not be granted.  On June 14, 2006, Respondent filed a motion to dismiss for failure to exhaust state remedies.  Finding that some of Petitioner's claims were unexhausted, the Court denied Respondent's motion to dismiss, and stayed the petition to allow Petitioner either to exhaust the unexhausted claims in state court or to file a First Amended Petition (FAP) omitting them. Petitioner chose the latter and filed his FAP on November 13, 2006. However, one unexhausted claim remains in the FAP, which the Court

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings.  Cal. Penal Code § 5075(a).

United States District Court

For the Northern District of California

1  will deny.

2      Petitioner currently has two other habeas corpus petitions

3  pending before this Court challenging subsequent denials of parole

4  by the Board.  Jay v. Curry, No. 4:08-cv-00845-CW (PR) (2008); Jay

5  v. Schwarzenegger, et al., No. 4:08-cv-01998-CW (PR) (2008).

6      Having considered all of the papers filed by the parties, the

7  petition is GRANTED and the matter is remanded to the Board to

8  reevaluate Petitioner's parole suitability in accordance with this

9  order.

10                              BACKGROUND

11  I.   The Commitment Offense

12      The following summary of the facts of Petitioner's commitment

13  offense is derived from the Los Angeles County Probation Officer's

14  Report.  (Resp't Ex. 2 at 2-6.)  On October 13, 1985, sixteen-year-

15  old Torran "Tory" Meier, decided to kill his mother, Shirley Rizk.

16  (Id. at 2.)  Prior to the crime, Meier received a promise of

17  assistance from Petitioner, who was eighteen years old, and Richard

18  Parker, who was twenty-three.  (Id.)  Meier produced a rope and

19  said that they would use it to strangle Rizk.  (Id. at 2-3.)

20  Meier's plan was to transport the body in the victim's car to the

21  Malibu Canyon area, light the car on fire, and push it over a cliff

22  in order to make it look like an accident.  (Id.)

23      The three went to Meier's home and Meier lured his mother into

24  his bedroom where Petitioner and Parker were waiting.  (Id. at 3.)

25  Parker placed a noose around Rizk's neck and began to strangle her.

26  (Id.)  Parker pulled on the rope around her neck, while Petitioner

27  and Meier pulled on her legs.  (Id.)  At some point during the

28                                  2

United States District Court
For the Northern District of California

strangulation, Rizk's eight year old son, Rory, awakened to her screams, went to investigate, and observed the strangulation. (Id.)  Meier took Rory away from the room in an effort to keep him from knowing what was happening.  (Id.)  The strangulation lasted approximately fifteen minutes before Rizk died.  (Id.)

Meier realized that Rory was a potential witness and decided that he would kill Rory with poison.  (Id. at 3-4.)  Meier sent Petitioner with some money to purchase snail and rat poison.  (Id. at 4.)  While Petitioner was gone, Parker and Meier placed Rizk's body in the trunk of her car.  (Id.)  Petitioner purchased the poison and returned to the Meier residence with it.  (Id.)  Meier attempted to poison Rory with a poison-laced sandwich and malt, but he refused to ingest it because of the taste.  (Id.)  Meier asked Rory to go for a ride in the Malibu Canyon and Rory agreed.  (Id.)

With Rizk's body in the trunk and Rory in the back seat, Petitioner, Meier and Parker drove away from the house.  (Id.)  En route they stopped at a gas station and purchased a gallon of gas. (Id.)  After driving through the Malibu Canyon area and finding a location to push the car over a cliff, they drove back to Petitioner's house where Petitioner retrieved his car and followed Meier and Parker back to the Canyon location.  (Id. at 4-5.)  Upon arrival, Petitioner apparently remained in his car while Meier and Parker got out.  (Id. at 5.)  Meier proceeded to pour gasoline on a rag, stuffed the rag into the gas tank of Rizk's car, blindfolded Rory, tied Rory's hands behind his back, and put him in the back seat of the car.  (Id.)  Parker then placed Rizk's body behind the steering wheel.  (Id.)  Meier and Parker pushed the car over the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

embankment as Parker lit the rag on fire. (<u>Id.</u>) The car rolled
down approximately thirty feet of the embankment. (<u>Id.</u>) The
parole officer's report does not indicate that Petitioner had any
direct involvement with fire or pushing the car down the
embankment. The perpetrators then left in Petitioner's car. (<u>Id.</u>)
Apparently, Petitioner transported Meier and Parker to Meier's car,
though the record does not describe this. Meanwhile, Rory was able
to untie himself, remove his blindfold, and climb out of the
burning car to call for help. (<u>Id.</u>)

A passing motorist saw the flames, heard Rory's call and
stopped to assist him. (<u>Id.</u>) The authorities arrived and spoke
with Rory. (<u>Id.</u>) Rory described Meier's car to a deputy sheriff.
(<u>Id.</u>) While that sheriff was following the ambulance transporting
Rory to a hospital, he saw the car Rory had described as Meier's
and pulled it over. (<u>Id.</u>) Meier and Parker were in the car and
the sheriff arrested them. (<u>Id.</u> at 5-6.) Parker made a full
statement implicating himself, Petitioner and Meier. (<u>Id.</u> at 6.)
On October 16, 1985, Petitioner was arrested. (<u>Id.</u>)

Petitioner told his probation officer that he had been under
the influence of marijuana, alcohol, cocaine, and hashish at the
time of the crime. (<u>Id.</u> at 14.) A friend of Petitioner's reported
to a probation officer that Petitioner had also taken LSD the
previous night. (<u>Id.</u>) At the time of his arrest, Petitioner
stated that Meier had offered him $2,000 for his assistance in the
murder, but that Petitioner never believed Meier would pay.
(Resp't Ex. 2, Probation Officer's Report at 14-15.)

Petitioner stated that Meier convinced him to assist in the

4

murder because of his "influential personality" and because he had "long been telling everyone [that Rizk] had been severely physically and emotionally abusing him." (Resp't Ex. 3, Probation Officer's Report at 7; Resp't Ex. 11, Psychological Evaluation by A.M. Charlens, Ph.D. at 1)

II.  Plea and Sentencing

Pursuant to a plea agreement, on January 12, 1987, Petitioner plead guilty to second degree murder and attempted murder.[2] (Resp't Ex. 1 Report--Indeterminate Sentence, Other Sentence Choice at 1.)  All additional allegations were dismissed by the district attorney.  (Resp't Ex. 4, Board Transcript at 84.)  Petitioner submits the declaration of Elliot Stanford, his attorney at the time he entered the plea, who declares that he had advised Petitioner that he would likely serve only seven to ten years of his sentence before being released on parole.  (Pet'r Ex. L, Stanford Declaration at 1.)  Stanford based this advice upon his communications with Mr. Feldman, the Deputy District Attorney prosecuting Petitioner's case.  (Id.)

On March 12, 1987, the superior court sentenced Petitioner to fifteen years to life in prison with the possibility of parole, plus the mid-term of seven years for the attempted murder charge, to run concurrently.  (Resp't Ex. 1 Report--Indeterminate Sentence,

---

[2] At a jury trial, Meier was found guilty of the lesser offenses of voluntary manslaughter, attempted voluntary manslaughter and conspiracy to commit manslaughter, apparently because of a "long history of abuse by his mother that led to the events." (Resp't Ex. 4, Board Transcript, at 87.)  Meier received a twelve-year sentence and was released in the early nineties. (Id. at 87.)

United States District Court

For the Northern District of California

Other Sentence Choice at 1.)  The judge agreed with Petitioner's attorney that Petitioner should be sent to the California Youth Authority rather than state prison.  (Resp't Ex. 3, Sentencing Transcript at 11, 16.)  Petitioner is currently incarcerated at the Correctional Training Facility at Soledad.  (Resp't Ex. 4, Board Transcript at 1.)  His minimum eligible parole date was October 18, 1995.  (Id.)

III. May 5, 2004 Board Hearing

Petitioner had been incarcerated for nearly twenty years at the time of his May 5, 2004 parole suitability hearing.  He was represented by counsel at the hearing.  (Resp't Ex. 4, Board Transcript at 2.)  During his incarceration, Petitioner maintained an exemplary record, remaining discipline-free with the exception of one minor 128(b) violation for smoking in 2000.  (Id. at 33.)

Petitioner presented the Board with an extensive record of his positive prison performance and rehabilitation.  At the time of the hearing, Petitioner was working as a production clerk with an above-standard evaluation and was working on a consumer specialist certification.  (Resp't Ex. 4, Board Transcript at 23, 31.)  On May 22, 2003, Petitioner had received a certificate of proficiency as a production coordinator and on October 3, 2003, he had received a forklift operator certificate.  (Id. at 24-25.)  Petitioner also held the jobs of vocational sewing machine shop assistant, janitor, and bakery porter.  (Id. at 25-26.)

Petitioner presented evidence that he had availed himself of many self-help, self-improvement and community programs in prison. (Id. at 23-36.)  He attained a high school equivalency diploma

6

early in his incarceration. (<u>Id.</u> at 27.)  At the time of the May, 2004 hearing, Petitioner had completed seventy-five out of 120 units necessary for a Bachelor's Degree from the University of Iowa. (<u>Id.</u> at 28.)  Petitioner has remained alcohol and drug free since his incarceration and regularly participated in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) programs, for which he received chronos. (<u>Id.</u> at 23.)  Petitioner completed the following courses in prison: Life Skills, Advanced Breaking Barriers, Alternatives to Violence, Reengaging into Society, Road to Happiness, Federal Emergency Management Agency Institute (FEMAI) Emergency Program Management, FEMAI Decision Making/Problem Solving, FEMAI Effective Communication and FEMAI Developing and Managing Volunteers. (<u>Id.</u> at 29-30, 35.)  After completing the Alternatives to Violence program, Petitioner became a peer facilitator in the program and received chronos for his work. (<u>Id.</u> at 29.)  Petitioner volunteered to organize both a Red Cross drive in 2001 and a Share a Bear Foundation program. (<u>Id.</u> at 34-35.)

The Board denied parole. First, the Board looked at Petitioner's pre-incarceration history, and noted that he had no prior criminal or juvenile arrest record. (<u>Id.</u> at 13.)  The Board noted that Petitioner had attained his high school equivalency diploma. (<u>Id.</u> at 31-32.)

The Board considered a 2002 report by Dr. Jeff Howlin, a staff psychologist. Upon assessing Petitioner's commitment offense, prior record and prison adjustment, the psychologist found that Petitioner's potential for violence within the controlled setting was "well below average relative to the Level II inmate

7

population." (Id. at 41.) Dr. Howlin found that, if Petitioner
were to be released into the community, his violence potential
would be "no more than the average citizen in the community."
(Id.) Dr. Howlin noted that Petitioner "demonstrated good insight
into his commitment offense" and "remorse for the victim and the
victim's family members." (Id. at 40-41.) Dr. Howlin described
the commitment offense as "quite violent" but found that it was
"quite removed from both [Petitioner's] history and functioning
since being incarcerated." (Id. at 40.)

Dr. Howlin noted, "[Petitioner] feels that his ongoing drug
use . . . significantly interfered with his ability to know right
from wrong . . . . Should [Petitioner] make the choice to use
substances again, his violence potential would be considered higher
than the average citizen in the community . . . however,
[Petitioner] does appear to have insight into his substance abuse
history and awareness of the idea that recovery from such a history
is most likely going to be an ongoing process and has made plans
for the future to address some of these issues." (Id. at 40-42.)
At the hearing, Petitioner stated, "There is no doubt in my mind
that I will continually go to AA and NA and do whatever it takes
for the rest of my life to stay sober." (Id. at 44.)

The Board then considered Petitioner's "tremendous" amount of
support, noting that sixty-one support letters were submitted on
his behalf by family, friends, church acquaintances and others.
(Id. at 18, 50.) Significantly, the parents of Shirley Rizk,
Rory's grandparents, had written the Board three times vigorously
endorsing Petitioner's parole and stating that they forgave

8

Petitioner.  (<u>Id.</u> at 52.)  Petitioner's godmother indicated in her letter that "[t]here are at least 50 homes open to [Petitioner] upon his release."  (<u>Id.</u> at 55-56.)  Five letters offered Petitioner employment.  (<u>Id.</u> at 51.)  Petitioner indicated that he intended to accept employment with the Reverend J. Jon Bruno of the Episcopal Diocese of Los Angeles while he pursued a career as a youth substance abuse counselor.  (<u>Id.</u> at 50, 52.)

In another letter of support, Susan Beck, a youth group counselor, stated that Petitioner had sent letters to her youth group and the youths' parents about the dangers of drug abuse, with descriptions of his own mistakes.  (<u>Id.</u> at 60.)  Ms. Beck concluded, "I can't tell you how much I appreciated Matthew's input or what a tremendous impact his candor made on the young people in this program."  (<u>Id.</u>)

The Board expressed concern that Petitioner had not "kept tabs" on Rory.  (<u>Id.</u> at 70.)  Petitioner explained that he wrote to Rory in 1993 to make amends, but that he did not want to injure, bother or upset him with further communications if they were unwanted.  (<u>Id.</u>)

Finally, the Board considered the opposition to Petitioner's parole.  A letter from the Los Angeles County Sheriff urged the Board to deny parole based on the circumstances of the commitment offense.  (<u>Id.</u> at 65.)  Los Angeles County deputy district attorney Dave Dahle attended the hearing and stated he was opposed to Petitioner's parole based on his concern that the commitment offenses were "particularly cold, calculated, well planned acts."  (<u>Id.</u> at 77.)  Dahle also expressed skepticism over Petitioner's

**United States District Court**
For the Northern District of California

claim of severe intoxication because "this inmate was able to negotiate the highways of the County of Los Angeles without getting stopped.  He wasn't that drunk . . . ."  (<u>Id.</u> at 78-79.)  Dahle concluded that Petitioner still needed to work on "the whys" before parole eligibility.  (<u>Id.</u>)

The Board concluded that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released.  (<u>Id.</u> at 99.)  Although the Board commended Petitioner for actively participating in self-help, staying discipline-free and achieving marketable vocational skills, it found that his gains did not outweigh the factors of unsuitability.  (<u>Id.</u> at 106-07.)  The Board also emphasized that, although Petitioner received letters from Ms. Rizk's parents, "they don't address anything at all about Rory, and you could not answer my questions about Rory and I think that is a big element that needs to be addressed before I can find that you are suitable for parole."  (<u>Id.</u> at 108.)

The Board stated that its primary reason for denying parole was the gravity of Petitioner's offense and the evidence that the offense involved "great violence and a high degree of cruelty and callousness."  (<u>Id.</u> at 99.)  The Board characterized Petitioner as dispassionate and calculated in committing the crime; one Commissioner reflected, "When I go to measure this crime against other crimes of a similar type, I can't come up with any, that's how egregious it is."  (<u>Id.</u> at 99, 112.)  The Board reasoned that the motive was very trivial in relation to the offense.  (<u>Id.</u>)  The Board found that Petitioner had an unstable social history based on

"chronic childhood depression" and "extensive use of alcohol."
(<u>Id.</u> at 104.)

Finally, the Board recommended that Petitioner seek further
psychiatric treatment based on a ten-year-old psychologist's report
that indicated Petitioner's violence potential to be average in the
past but estimated to be decreased. (<u>Id.</u> at 105.) The Board also
stated that further psychiatric treatment was necessary to address
a fourteen-year-old psychologist's report that observed that "the
elements within [Petitioner] of a deeper level of motivation have
yet to be addressed." (<u>Id.</u>) The Board characterized several
psychologists' reports endorsing parole as merely "recent gains."
(<u>Id.</u> at 106.)

At the time of the May 5, 2004 parole suitability hearing,
Petitioner had already been denied parole five times. (<u>Id.</u> at 14.)

IV. Superior Court Petition for Writ of Habeas Corpus

On January 31, 2005, Petitioner filed a petition for a writ of
habeas corpus in superior court challenging the Board's decision.
(Resp't Ex. 17, May 25, 2005 Los Angeles County Superior Court
Order at 3-4.) The court denied the petition, on the ground that
there was "ample evidence" in the record about the commitment
offense alone to support an unsuitability finding:

> It was undeniably dispassionate and calculated,
> involved multiple victims, the adult victim was
> abused, and the petitioner's motive was very
> trivial. Moreover, the circumstances of the crime
> are more than the minimum necessary to sustain a
> conviction for second-degree murder.

(<u>Id.</u> at 3.) The court concluded that "the nature of these crimes
is enough to conclude petitioner is a public danger." (<u>Id.</u>)

11

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The court noted that, while the Board's decision was also

2 based on a prior unstable social history evidenced by childhood

3 depression and alcohol and drug use, "there is no evidence in the

4 record that either of those contributed to unstable or tumultuous

5 relationships with others."  (Id.)  Therefore, the court based its

6 denial of the petition solely on the circumstances of the

7 commitment offense.

8    On July 6, 2005, Petitioner filed supplemental points and

9 authorities in support of his petition. (Resp't Ex. 18.)  On

10 August 5, 2005, the superior court found that it had already

11 considered the supplemental issues.  (Resp't Ex. 19, Aug. 5, 2005

12 California Superior Court Order re: Writ of Habeas Corpus at 1.)

13 On September 29, 2005, the superior court again denied Petitioner's

14 petition.  (Resp't Ex. 21, Denial of Reconsideration at 2.)

15    Petitioner filed subsequent habeas petitions in the California

16 court of appeal and the California Supreme Court.  Both petitions

17 were summarily denied.  (Resp't Ex. 23, Oct. 27, 2005 California

18 Appellate Court Order at 1; Resp't Ex. 25, Jan. 25, 2006 California

19 Supreme Court Order at 1.)  Subsequently, Petitioner brought a

20 federal habeas corpus petition in this Court challenging the state

21 court decisions upholding the Board's determination.

22                           DISCUSSION

23 I.   Standard of Review

24    Because this case involves a federal habeas corpus challenge

25 to a state parole eligibility decision, the applicable standard is

26 contained in the Antiterrorism and Effective Death Penalty Act of

27 1996 (AEDPA).  McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir.

28                              12

**United States District Court**
For the Northern District of California

2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under § 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). In this case, the last state court opinion to address the merits of Petitioner's claim is that of the California superior court.

II. Analysis

Petitioner argues that (1) he was denied due process because the Board's decision was not supported by some evidence that he is presently dangerous; (2) the State violated his plea agreement; (3) the Board violated Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000), by relying on unproven facts related to a special circumstances allegation that was dismissed; and (4) the Board relied upon unconstitutionally vague regulatory language in making its determination of unsuitability.

United States District Court
For the Northern District of California

1

A.   Due Process Claim

2        The United States Supreme Court has clearly established that a

3  parole board's decision deprives a prisoner of due process with

4  respect to his constitutionally protected liberty interest in a

5  parole release date if the board's decision is not supported by

6  "some evidence in the record," or is "otherwise arbitrary."  Sass

7  v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.

8  2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)).

9        Respondent argues that California inmates do not have a

10  federally protected liberty interest in parole release and that the

11  Ninth Circuit's holding to the contrary in Sass is not clearly

12  established federal law for the purposes of AEDPA.  However, this

13  Court is bound by Ninth Circuit authority.  See, e.g., Irons v.

14  Carey, 505 F.3d 846, 850 (9th Cir. 2007) (all California prisoners

15  whose sentences provide for the possibility of parole are vested

16  with a constitutionally protected liberty interest in the receipt

17  of a parole release date, a liberty interest that is protected by

18  the procedural safeguards of the Due Process Clause); McQuillion,

19  306 F.3d at 898 ("under clearly established Supreme Court

20  precedent, the parole scheme in California . . .[gives] rise to a

21  constitutionally protected liberty interest).  Therefore, this

22  claim fails.

23        When assessing whether a state parole board's suitability

24  determination was supported by "some evidence," the court's

25  analysis is framed by the statutes and regulations governing parole

26  suitability determinations in the relevant state.  Sass, 461 F.3d

27  at 1128.  Accordingly, in California, the court must look to

28                                    14

California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle.   Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to consider.   See 15 Cal. Code Regs. tit. 15 § 2402(b). These include "[a]ll relevant, reliable information available," such as,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner

committed the offense in an especially heinous, atrocious or cruel manner." Id. at (c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. Id. at (d). In a recent decision, the California Supreme Court stated that due process is denied when "an inquiry focuse[s] only upon the existence of unsuitability factors." In re Lawrence, 44 Cal. 4th 1181, 1208 (2008).

Respondent contends that even if California prisoners do have

16

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

a liberty interest in parole, the due process protections to which they are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial.  This position, however, has likewise been rejected by the Ninth Circuit, which held in Irons, 505 F.3d at 851 that a prisoner's due process rights are violated if the Board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."  The "some evidence" standard identified is thus clearly established federal law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1128-1129.

In that the superior court stated that the Board's unstable social history justification was unfounded, the superior court upheld the denial of Petitioner's parole based solely on his commitment offense.  It is undeniable that the offense was brutal and heinous.  These facts are immutable.  However, the Ninth Circuit has held that continuous reliance over time on static factors such as the commitment offense could violate due process.  See Irons, 505 F.3d at 851; Sass, 461 F.3d at 1129; Biggs v. Terhune, 334 F.3d 910, 916-917 (9th Cir. 2003).

The original sentence here bears on the evaluation of heinousness.  Petitioner was given a midterm, concurrent sentence for his attempted murder conviction.  With the agreement of the prosecutor, the judge committed Petitioner to the California Youth Authority rather than state prison.  (Resp't Ex., Sentencing Transcript 3 at 14, 16.)  This, too, weighs against a finding of the utmost heinousness and demonstrates the trial judge's view that Petitioner was capable of rehabilitation.

United States District Court
For the Northern District of California

The Ninth Circuit has not specified the number of denials or the length of time served beyond the minimum sentence that would constitute a due process violation, but Petitioner has served considerably more than his minimum sentence of fifteen years and was denied parole by the Board for the sixth time at the 2004 hearing.  The question is whether it is reasonable after twenty-three years to find that the facts of the offense constitute some evidence that Petitioner would presently be a danger to society if released.  Petitioner possesses each of the suitability factors the Board was bound to evaluate.  He has no juvenile or adult convictions save for the commitment offense.  He has expressed remorse.  He has a stable social history, evidenced by nearly ten years of psychological reports indicating social stability and recommending parole.

The Board overstated some of the unsuitability factors relating to the static facts of the commitment offense.  In particular, the motive for the crime is not "inexplicable or very trivial" in relation to the offense.  Meier, the undisputed mastermind of the crime, convinced Petitioner that he was being abused by his mother, just as he convinced a jury of the same. That a jury convicted Meier only of the lesser offense of voluntary manslaughter and that he was released in the mid-nineties weighs against the triviality of the motive.

The Board also overemphasized older psychologist reports, and dismissed current reports as merely "recent gains."  In particular, the Board used a 1990 report that obliquely indicated, "the elements within [Petitioner] of a deeper level of motivation have

18

**United States District Court**
For the Northern District of California

yet to be addressed."  (Resp't Ex. 11, Charlens Report at 1.)
Though the Board viewed this as indicative of a need for further
treatment, subsequent psychological reports contradict that
analysis.[3]

The Board also placed undue emphasis on the fact that
Petitioner had not "kept tabs" on Rory.  However, Petitioner wrote
him a letter to make amends in 1993, to which he received no
response.  It was reasonable and conscientious for Petitioner to
determine that further attempts at communication could cause Rory
further emotional hardship.

The California Supreme Court recently clarified the
appropriate analysis for a reviewing court, even when the
commitment offense involves aggravated circumstances.  <u>Lawrence</u>, 44
Cal. 4th at 1214.

> The aggravated nature of the crime does not in and
> of itself provide some evidence of <u>current</u>
> dangerousness to the public unless the record also
> establishes that something in the prisoner's pre-
> or post-incarceration history, or his . . . current
> demeanor and mental state, indicates that the

---

[3]In Petitioner's subsequent parole hearing on February 16,
2007, he presented a report from Dr. Merrick which directly
addressed the 1990 report.  <u>Jay v. Schwarzenegger, et al.</u>, No.
4:08-cv-01998-CW (PR) (2008), Pet'r Attachment 1, Parole Board
Transcript at 27.  The transcript of this hearing is judicially
noticeable as it is also before this Court as an attachment to
another petition.  <u>See</u> <u>Lee v. City of Los Angeles</u>, 250 F.3d 668,
668-690 (9th Cir. 2001) (a court may take judicial notice of
undisputed matters of public record); Fed. R. Evid. 201.  In
response to Charlens' report, Dr. Merrick stated, "This evaluator
respectfully believes that being easily influenced and immaturity
are reasonable, probably accurate inferences to be made from Jay's
behavior, but there are no apparent pre- or post-offense behaviors
that confirm these hypotheses or turn them into lifelong deep-
seated unalterable traits for which psychotherapy is mandated.  For
example, there is no evidence that Jay ever allowed the world class
predators in prison to manipulate him."  <u>Id.</u> at 27-28.

**United States District Court**
For the Northern District of California

> implications regarding the prisoner's dangerousness
> that derive from his . . . commission of the
> commitment offense remain probative to the
> statutory determination of a continuing threat to
> public safety.

<u>Id.</u> The court further clarified, "To the extent [the language of

<u>In re Rozenkrantz</u>, 29 Cal. 4th 616, 683 (2002)("a life term offense

or any other offenses underlying an indeterminate sentence must be

particularly egregious to justify the denial of a parole date")]

has been read to suggest that reliance solely upon the

circumstances of the commitment offense would violate an inmate's

due process rights <u>only</u> in those cases in which the circumstances

of the crime are not particularly egregious, we emphasize that due

process cannot, and should not, be so narrowly defined." <u>Lawrence</u>

at 1214.

The Board noted but gave no weight to the other evidence which

militated against a finding that Petitioner is currently dangerous.

Petitioner's last six psychological reports conclude that

Petitioner will not pose a danger if released. (Pet'r Ex. B, 1994

Psychiatric Evaluation by Ronald H. Kitt, Ph.D. at 194-195; 1995

Psychological Evaluation by S. McDill, Ph.D. at 191-193; 1998

Psychological Evaluation by Dean Clair, Ph.D. at 189-190; Pet'r Ex.

U, 1999 Updated Conclusions and Recommendations by Marilyn Kennedy,

M.S., M.S.W., L.C.S.W., Ph.D. at 585; Pet'r Ex. B, 2001

Psychological Evaluation by Joe Reed, Ph.D. at 183-188; 2002

Psychological Evaluation by Jeff Howlin, Ed.D. at 174-181.) Dr.

Kennedy's 1999 report, which was before the Board at the 2004 and

prior hearings, stated that Petitioner will not return to drugs,

repeat his crime, or be a danger to himself or others. (Pet'r Ex.

U at 585.)  Dr. Howlin's report indicated that Petitioner "appears to have insight into his substance abuse history, and awareness of the idea that recovery from such a history is most likely going to be an ongoing process."  (Pet'r Ex. B, Howlin Report, 2002, at 180.)

Petitioner has served considerably more than his minimum term of fifteen years, and more than the parole matrix for aggravated second-degree murders.[4]  Petitioner's commitment offense carries a maximum penalty of life with the possibility of parole.  The Board's decisions threaten to increase this sentence to one of life without parole.

Furthermore, Petitioner's present age of forty-one years suggests a reduced possibility of recidivism.  He has made realistic plans for release, as evidenced by numerous letters from family members and friends indicating that they can assist him with employment and housing.  Petitioner's educational achievements, including his high school equivalency diploma, associate's degree, and substantial progress towards a bachelor's degree, have given him marketable skills that can be put to use on release.  His institutional activities, such as rehabilitation programs and vocational and charitable work, indicate an enhanced ability to function within the law upon release.

---

[4] In a subsequent parole board hearing in 2007, one of the Commissioners found Petitioner suitable for parole.  Jay v. Schwarzenegger, et al., Case No. 4:08-cv-01998-CW (PR) (2008), Pet'r Attachment 1, Parole Board Hearing Transcript Feb. 16, 2007 at 72.  The Commissioner found Category III(c) of the matrix (Cal. Code Regs. tit. 15, § 2403(c) to be appropriate for Petitioner. (Id. at 75-76.)  The Commissioner calculated that a release date should be set after 252 months (21 years).  (Id. at 76.)

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

In light of Petitioner's entire record, including his age at the time of the crime, his violence-free years before he was arrested, his lengthy incarceration, and his rehabilitation through education, good conduct and charitable work, his commitment offense, which occurred nearly twenty-three years ago, no longer constitutes "some evidence" that his release will pose an imminent danger to public safety. The Board's continued reliance upon the commitment crime alone violated Petitioner's due process rights, and the state court's affirmation of the Board's denial was unreasonable in light of the facts and an unreasonable application of United States Supreme Court law. Accordingly, Petitioner's due process claim is GRANTED.

Petitioner also raises three alternative grounds for habeas relief. Although there is no need to address these claims because Petitioner is entitled to relief based on his first claim, the Court will do so below.

B.   Plea Agreement Claim

Petitioner claims that the Board violated his plea agreement. This claim is without merit.

Plea agreements are contractual in nature and subject to contract law standards of interpretation. In re Ellis, 356 F.3d 1198, 1207 (9th Cir. 2004) (citing United States v. Hyde, 520 U.S. 670, 677-78 (1997)). Thus, a petitioner is entitled to habeas relief if he or she enters into a plea agreement with a state prosecutor, and the prosecutor breaches the agreement. Gunn v. Ignacio, 263 F.3d 965, 969-70 (9th Cir. 2001). However, after sentencing, a defendant who pleads guilty may not collaterally

22

United States District Court
For the Northern District of California

challenge a guilty plea that was voluntary and intelligently entered into with the advice of competent counsel.  <u>United States v. Broce</u>, 488 U.S. 563, 572 (1989).  Nor may a defendant collaterally attack the plea's validity merely because he or she made what turned out, in retrospect, to be a poor deal.  <u>Bradshaw v. Stumpf</u>, 545 U.S. 175, 186 (2005).

Petitioner characterizes his plea agreement as a contract between the prosecutor and the sentencing court.  However, it was an agreement between Petitioner and the district attorney.  The plea agreement specified that Petitioner would plead guilty to second degree murder and attempted murder and, in return, the district attorney would dismiss all additional charges.  (<u>See</u> Resp't Ex. 2, Probation Officer's Report at 1; Resp't Ex. 1, Report-Indeterminate Sentence at 1.)  Petitioner provides evidence from his attorney at the time that the deputy district attorney handling the case told him that the "approximate" time Petitioner would spend in custody would be seven to ten years.  (Pet'r Ex. L, Declaration of Elliot Stanford, at 540.)  This hearsay evidence is inadmissible and, furthermore, the prosecutor's oral representations cannot change the written agreement of the parties.

Petitioner does not argue that the plea agreement is anything other than the agreement described by the judge, nor does he argue that the prosecutor violated the agreement by pursuing any of the other charges.  Therefore Petitioner's argument that his plea agreement was violated fails.

C.    <u>Apprendi</u> Claim

Petitioner argues that the Board used inadmissible evidence in

23

**United States District Court**
For the Northern District of California

making the parole determination, because it considered allegations to which Petitioner had not plead guilty.  This claim is without merit.

The United States Supreme Court has ruled that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 488-90.  For example, an allegation that a criminal defendant used a firearm in the commission of the underlying offense may not be adjudicated by a judge alone where doing so could alter the maximum penalty for the crime.  Dillard v. Roe, 244 F.3d 758, 773 (9th Cir. 2001).

Apprendi does not apply here because the statutory maximum for second degree murder in California is an indeterminate life sentence.  Cal. Penal Code § 190(a).  Accordingly, because the decision to deny parole was based on the facts to which Petitioner plead guilty, and the decision neither increased the maximum penalty for second degree murder nor Petitioner's sentence, Petitioner's Apprendi claim is DENIED.

D.    Unconstitutional Vagueness Claim

Petitioner claims that, "as applied" to him, the language of section 2402 of the California Code of Regulations governing parole suitability is unconstitutionally vague.  Petition at 35.  Although this claim is unexhausted, the Court has the authority to deny it on the merits, 28 U.S.C. § 2254(b)(2), "when it is perfectly clear that the applicant does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005).

24

United States District Court
For the Northern District of California

An enactment is void for vagueness under the constitutional principle of due process if its prohibitions are not clearly defined.  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). This is because laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited.  Id.  Also, laws must provide explicit standards to those who apply them so they may not be enforced in an arbitrary and discriminatory manner.  Id. at 109.

California Code of Regulations, title 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if, in the judgment of the panel, the prisoner will pose an unreasonable risk of danger to society if released from prison.  Cal. Code Regs. tit. 15, § 2402(a).  Section 2402(c) and (d) provides the factors that tend to show unsuitability or suitability for parole.  A finding that the inmate poses an unreasonable risk to society can be made solely on the basis of the commitment offense only if the offense is "especially heinous, atrocious, or cruel."  Cal. Code Regs. tit. 15, § 2402(c)(1).  However, the California Supreme Court recently clarified these regulations in Lawrence.  The court explained that a determination based on section 2402(c)(1) must also explain why the egregious commitment offense "remains probative to the statutory determination of a continuing threat to public safety." Lawrence, 44 Cal. 4th at 1214.

Petitioner argues that the factors listed in section 2402(c) that determine whether a crime was committed in an especially

United States District Court
For the Northern District of California

heinous, atrocious or cruel manner are "purely subjective" and that, because they are difficult to understand, Petitioner had inadequate notice regarding the manner in which the factors would apply to him.  Petition at 35.

The regulations define the terms in an unambiguous manner.  An offense is considered "especially heinous, atrocious, or cruel" if it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" or "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code Regs. tit. 15 § 2402,(c)(1).  The regulations further clarify the analysis by providing a list of factors that support a finding of a commitment offense that was performed in a "heinous, atrocious, or cruel" manner.  Cal. Code Regs. tit. 15 § 2402(c)(1). The regulatory explication, along with the state court guidance on the proper application of the regulations creates a scheme that is not unconstitutionally vague as applied to Petitioner. Petitioner's unconstitutional vagueness challenge to section 2402(c) is DENIED.

                              CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is GRANTED.  The Board shall hold a new parole hearing within sixty (60) days and re-evaluate Petitioner's suitability for parole in accordance with this order.  If the Board finds Petitioner suitable for parole and sets a release date and the Governor does not reverse, the Court will stay Petitioner's actual release for two weeks to allow Respondent to request a stay from this Court and if necessary from the Court of Appeals, of the

                                26

1    release date pending appeal.   The Court retains jurisdiction to

2    review compliance with its order.

3         The Clerk of the Court shall terminate all pending motions,

4    enter judgment and close the file.   Each party shall bear his own

5    costs.

6         IT IS SO ORDERED.

7

8    Dated:   11/12/08

                                    _____
9                                   CLAUDIA WILKEN
                                    United States District Judge
10

**United States District Court**
For the Northern District of California

27